UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

UNITED STATES OF AMERICA

     -v-                                               No.  08-CR-924-LTS

JOHN MARSHALL

     Defendant.

----------------------------------------------------------x

<u>ORDER</u>

        The Court has received Defendant John Marshall's letter, along with two exhibits, in which he purports to lay out a theory for challenging his criminal conviction.  Mr. Marshall's letter concludes by asking for legal advice regarding his challenge.  Judicial and court officers are not permitted to provide legal advice to parties, including individuals who are proceeding <u>pro se</u>.  If Mr. Marshall seeks legal advice regarding his case, he should contact an attorney licensed to practice law.  If Mr. Marshall wishes to obtain court forms or procedural information, he may contact the Pro Se Intake Unit for assistance at (212) 805-0175.

        Because Mr. Marshall's submission includes a sensitive, unredacted witness proffer, the Court will file that exhibit under seal.  The remaining submission is appended to this Order.  Chambers will mail a copy of this Order to Mr. Marshall.

        SO ORDERED.

Dated: New York, New York
      May 16, 2023

                                  /s/ Laura Taylor Swain
                                  LAURA TAYLOR SWAIN
                                  Chief United States District Judge

**Mail Copy to**:
John F. Marshall
8990 Quarry Drive
Naples, FL 34120

# EXHIBIT

RECEIVED
SDNY PRO SE OFFICE

2023 MAY -1  PM 3: 54

John F. Marshall
8990 Quarry Drive
Naples, FL 34120

May 1, 2023

Honorable Laura Taylor Swain
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Case:  Docket No.: 08 CR 924-01(LTS)

Dear Judge Swain:

I am not an attorney, but you handled my case some years ago so you seem to be the right person to raise this issue with. I am probably beating a dead horse here, but I have been seriously upset about succumbing to the pressure from my attorney (Larry Iason) to take a plea agreement he worked out with the then Assistant U.S. Attorney (Glen McGorty). This was in 2008. The case involved a charge of conspiracy to commit securities fraud (involving insider trading by a partner in my consulting firm). Essentially, I was a partner in a financial consulting firm called Marshall, Tucker & Associates (MTA). The firm had three partners:  myself, Alan Tucker, and Mark Larson. At the time of the alleged offense (2007), I was the Vice Chairman of the International Securities Exchange (ISE) and a retired university professor (I had taught for twenty-one years at St. John's University and Polytechnic University). Polytechnic in now part of NYU. Alan Tucker, in addition to being a partner in MTA, was a professor at Pace University. Mark Larson had no other employment other than his role as a partner in, and office manager for, MTA.

All three partners were arrested on March 12 or 13, 2008 and charged the following day. The charge involved insider trading in ISE stock. Alan Tucker had traded in that stock believing that the ISE was the target of a takeover. The government's contention was that I had given him inside information about a pending acquisition. I plead not guilty at the arraignment the day after my arrest. As the months passed my attorney, Larry Iason, kept telling me that he would work out a plea agreement and that I should take it. At first, I insisted I would not, as I had not done anything and would not plead guilty to something I had not done. Mr. Iason, however, was determined. He kept telling me that the government told him they had two witnesses that claimed I had given them inside information. Since there were only two people who could possibly be such witnesses (Alan Tucker and Mark Larson) as they and I were the only ones at our annual partners' meeting where my information disclosures were supposedly made. Mr. Iason agreed that those were indeed the government's witnesses.

Mr. Iason told me that it would cost me at least $2 million to defend myself and that since the government claimed it had affidavits from two witnesses (and I had no witnesses to contradict them) I would lose. He said I could potentially get a much longer sentence if I did not take the plea agreement he was working on with Glen McGorty. I knew I could not afford, either financially or emotionally, to put my family through a trial. So, I said to my attorney, Larry Iason, can we get copies of those affidavits before I make

a decision. He informed me that I did not have a right to them unless I elected to go to trial. At that point I felt utterly defeated and chose to take the plea agreement.

My plea of guilty, under the terms of the plea agreement (the final draft of which I was only handed 15 minutes before we went into court and did not have time to read, but I had read an earlier draft) was supposed to take place in front of you. But you were not available that day and I was told I would be pleading in front of Magistrate Judge Douglas F. Eaton. My attorney insisted it did not matter who I plead in front of, so I agreed and signed the plea agreement. This was on September 25, 2008.

In the process of that plea allocution, Judge Eaton said to the prosecutor Glen McGorty that Mr. Marshall (meaning me) had the right to hear the evidence against him before he plead. I do not want to reiterate all that was said at that hearing since you already have that in your files. But I do want to stress a little bit of what the prosecution (Glen McGorty) said. He said (on page 9 of the transcript) *"Had this matter proceeded to trial, your Honor, the government would have proved its case using documentary evidence, as well as witnesses against Mr. Marshall."* Notice that the government said "witnesses" (plural). I of course plead guilty as that was what I was there for.

On December 15, 2008, I appeared before you for sentencing. You sentenced me to 18 months confinement, to be followed by one year of home confinement, three years of supervised release, 300 hours of community service, a $10,000 fine, and $100 of court costs.

I did all those things plus a few hundred hours of extra community service and you subsequently dropped the supervised release part of the sentence. So, in mid-2011, I was finally free to go on with my life. This episode had the effect of destroying my reputation, my business, and eventually my 39-year marriage. The costs associated with defending myself and the loss of my business put extreme financial stress on me and my family. Further, any future meaningful employment was not possible at my age and under my health constraints. So, I retired.

All this remained as it was until a few years ago when, in 2016, I stumbled across some articles related to a case similar to mine that involved the *Dirk's v. Securities and Exchange Commission* decision. This pertained to the question of whether or not I, as the alleged tipper, had received or had been promised compensation for providing information. Since I had not provided Tucker with information, nothing had been promised to me. Further, the government never alleged that I had received any compensation of any kind from Tucker. I then hired a new attorney by the name of Alan Lewis. Mr. Lewis contacted my attorney in the original criminal case (Larry Iason) who admitted he had never advised me of this element of the law. Mr. Lewis subsequently filed a *Writ of Error Coram Nobis* to get my conviction overturned. It resulted in a split decision of the three-judge court and I lost. But that is not the interesting part. As part of the discovery process, Mr. Lewis requested the affidavits from the people the government said would be their witnesses. As expected, there were two: Alan Tucker and Mark Larson. What is interesting is that Mr. Tucker's affidavit was what the government claimed (inculpatory), but the affidavit of Mark Larson was largely redacted. Mr. Lewis insisted that we were entitled to the unredacted version and eventually the government provided it. I think this was in 2018.

With the redactions eliminated, it became clear that Mr. Larson had said nothing that would corroborate the government's case. In fact, it said precisely the opposite and was completely exculpatory. This had been willfully hidden from me by the government throughout the six months from the time of my arrest until the time I accepted the plea agreement. I asked Mr. Lewis to make this a Brady violation case, but we had already submitted everything by the time we made this discovery. My point is that the U.S. Assistant Attorney Glen McGorty had straight out-and-out lied to my original attorney (Larry Iason) and had straight out lied to me and to the court (which was supposed to be you but was Judge Eaton, in your place). Though the lie was told to Judge Eaton, it was indirectly told to you because the case was

2

assigned to you and you sentenced me for what Mr. McGorty claimed was the evidence the government had.

I am attaching a copy of Mark Larson's affidavit, as it was originally provided to Mr. Lewis (with the government's redactions) and a copy of the unredacted version we later received. It seems to me that the Brady violation is as clear as a bell and that the government knew this and hid the evidence. I am hoping you will agree.

The government had from mid-March of 2008 until the day of my plea allocution, September 25, 2008, to furnish their evidence (i.e., the witnesses' proffers) to my attorney. This is more than six months. But the government never did. Further, the government lied about the contents of those proffers (at least the exculpatory one) to me, to my attorney, and to the court. Further, the government clearly had no intent of divulging the exculpatory evidence in the Larson proffer or they would not have redacted it.

I now believe that I had an absolute right to see those proffers before deciding if I would accept a plea agreement or choose to go to trial. As I said at the beginning of this letter, I am not an attorney. But I have read up on the Brady rules. I believe that the government had an obligation to provide those proffers to my attorney and to do so in a timely manner even if my attorney did not explicitly request them. Essentially, the government knowingly and willfully suppressed exculpatory evidence in order to get a conviction. The Larson proffer also represents impeachment evidence as it directly contradicts what Tucker's proffer claimed. I believe that had those proffers been provided to my attorney, as the law requires, it is highly probable that the government would have dropped the charges against me.

I would have broached this matter with you much earlier had I known that there had been a serious Brady violation. But that discovery only grew out of ISON my recent filing of a *Writ of Error Coram Nobis*.

I no longer have the financial resources to fight another battle, and my health is failing as well. Further, I am now 71 and reside in Florida. Traveling is not easy for me. My gut wants me to fight for my conviction to be overturned, or barring that, bring a civil suit against the government. But, again, I lack the financial resources and the physical stamina for such a fight. I am writing all this to you for two reasons: (1) I hope you might have some means to correct this wrong, and (2) I don't want to see this happen to other people.

As a side note, the government dropped its case against Mark Larson completely, and Alan Tucker was eventually sentenced to a short period of home confinement. It is not hard to figure out why Alan Tucker was so willing to say whatever the government wanted him to say.

Any thoughts or advice would be greatly appreciated. I apologize for taking up your time. I know you are busy.

Sincerely,

John F. Marshall

Attachments: Redacted Proffer of Mark Larson
              Unredacted Proffer of Mark Larson

3

Exhibit 1


Redacted Proffer of Mark Larson

Sentinel Working Copy   Case 1:17-cv-02951-AJN   Document 22-2   File █████████████████

**Filing and Security**
**Primary Case:** ████████████

**Case Title:** (U) MARSHALL, JOHN TUCKER, Full Inve:
ALAN MARSHALL, JOHN TUCKER,
ALAN

**Serial Number:** 22
**Serialized:** 07/10/2008
**Category:**
**Initiated:** 10/18/2007

**Details**
**Serial #:** 22
**Type:** FD302

**Document Title:** PROFFERED FOR MARK R. LARSON

**Approval Date:** 07/10/2008
**Classification:** U

**Contents:** 07/18/2008

MARK R. LARSON, ████████████████████████ was



proffered in reference to his trading of ISE stock. Present during
the proffer were AUSA Glen McGorty of the Southern District of New
York as well as Steven Kobre and Celia Cohen of Kobre & Kim,
representing LARSON. After being advised of the identity of the
interviewing agent and the nature of the interview LARSON provided
the following information:

AUSA McGorty reviewed the proffer agreement with LARSON.
LARSON acknowledged he understood the agreement and the proffer
agreement was executed.

LARSON began to work with MARSHALL in the late eighties
or early nineties. ALAN TUCKER began to work at MARSHALL TUCKER &
ASSOCIATES in 1995 or 1996. The business was first called MARSHALL
& ASSOCIATES and later called MARSHALL TUCKER & ASSOCIATES (MTA)
after TUCKER joined the firm. More recently MARSHALL's daughter
CARA became a partner in the firm.

LARSON's role at MTA was to deal with the contracts,
billing and the human resources persons at the companies MTA was
working with. LARSON also handled business for the INTERNATIONAL
ASSOCIATION OF FINANCIAL ENGINEERS (IAOFE). The IAOFE is an
organization that brings Wall Street and mathematicians together.





LARSON held twenty eight percent ownership in MTA.
TUCKER and MARSHALL held about thirty five percent ownership in

Sentinel Working Copy    Case 1:17-cv-02951-AJN   Document 22-2   Filed 11/15/17   Page 3 of 5
https://sentinel.fbi.org/sentinel/lavender/#/Serials/139031240

MTA. The partners earn monthly draws based on their percentages of
ownership. Over the years the partners have used their equity to
buy cars. LARSON had planned on using his money to buy a house but
he got a three percent mortgage. At one time, MARSHALL wanted to
use his share of MTA funds to buy an apartment. When one of the
partners made a request for funds, LARSON would check to make sure
there were enough funds left so the company could continue to run.
All three partners would agree to let the money be taken out and
notice would have to be given.



Sentinel Working Copy   Case 1:17-cv-02951-AJN   Document 22-2   Filed 11/15/17   Page 4 of 5
https://sentinel.fbinet.fbi/lavender/#/Serials/139031240



Routing

Drafted by:

Approved by:

# FILED UNDER SEAL